Your Honor. You may proceed when you're ready. Thank you, Judge. Good morning, Your Honors, and may it please the Court. I'm Robert Greenspan, representing the Receivership in this case. And Your Honors, let me start with three undeniable material factual errors in the summary judgment decision itself. And what I'm going to talk about are mistakes about the timeline, about the structure of the scheme accounts. And in particular, let's start with a timeline. On page 15 of the summary judgment decision, the District Court determined that the evidence of a particular meeting in April or May of 2008 simply meant that Mr. Sorrell should have inquired further into the legitimacy of the already formed account number 1705. Now, 1705 was the central fraud account of the scheme, held investor funds. That revealed a mistake in the timeline, because 1705 hadn't been formed yet. And in the April and May 2008 meeting, what Mr. Sorrell's learned was that the main investment destination or the there was at least a $13 million shortfall. He also learned that the accounts were not segregated. Now, that's important and material, because segregation, along with no risk to the investors, along with liquidity for the investors, along with greater than 10% returns, double-digit returns, those were the proper ways that these entities would have exercised or would have performed for managing and holding these accounts. So in April, May 2008, before forming 1705, Mr. Sorrell's learned that none of the four pillars of how these funds were supposed to be handled were being respected by these individuals. Then it was a month later, unlike the District Court's misimpression, it was a month later that the account was formed with what we're counting so far as three explicit false statements on the account opening papers, two implicit ones, and I can, of course, go into those, and they're in our briefing. What those papers had when they were formed was the most bland expression of a new business account that you could possibly have, and it certainly didn't reflect the formation of an investment account, which, as our expert testified, that an investment account or a money manager account would have been subject to designation as the quote-unquote highest risk under the Bank Security Act. The second mistake in the summary judgment decision, mistake of fact, just clear, is that on page 11 of that decision, the District Court believed that Sorrell's had no role in preparing these account opening papers. That is completely contradicted by the fact that Ms. Espy testified that she was directed by Mr. Sorrell's. The testimony also shows that her job was to support Mr. Sorrell's. She was directed by him to actually choose the checking money market designation. Without any designation anywhere else in the account opening materials, that this was an account that was to hold investor funds. So in presenting your three main fact errors, what you're saying is that you're not presenting to us what actually happened. You're just saying it's still in dispute, that the District Court improperly decided these issues? Is that where we're going here? That's a good question, but it's more in line with showing that the District Court simply didn't understand what was going on in the record itself, and therefore formed a misimpression that there could not be reasonable inferences of knowledge and substantial assistance. You're one step behind that. I'll get to that, if time permits, of course. I'll go through just a litany of other underlying facts that, to the District Court's credit, it recognized existed in the record, but should have permitted the formation of reasonable inferences of knowledge and substantial assistance. But turning back one final error, I'll run by it real quickly. The structure of the scheme accounts. So on page 13 of the District Court's decision, the District Court was under the misimpression that it was Cook, the ringleader himself, who delivered or handed the 1705 account opening papers to Sarles to begin that process. In fact, it was Kiley and Smith. These are just fundamental errors in the District Court's decision. Why does it matter? Of course, this Court will review judgments, not opinions. We respect that, of course. It matters because in Sarles' head, he had been exposed to the inconsistency between the four pillars of how these accounts were supposed to be managed and how they were, in fact, managed. And what did he do? He deepened the bank's relationship a month later with the scheme by forming the 1705 account, the very account that was going to pass through about $90 million of victim funds. So when the District Court had the misimpression that it was something more innocuous, it was just the failure to sort of catch some red flags that were flying around in the air, that itself shows that summary judgment should be reversed. So it's enough, as I said, to show the pure conceded factual errors in the District Court's summary judgment decision. But of course, as I was hinting at, there's a wealth of additional evidence in the record that was mistreated and should have been treated as giving rise to reasonable inferences of knowledge and to draw these inferences and call them reasonable, as my colleague will probably stand up here and say, especially in view of the legal backdrop for this type of a claim. And that legal backdrop says that state of mind is provable by circumstantial evidence, K&S partnership. Atypical conduct, lacking business justification, demonstrates knowledge of the actor for purposes of aiding and abetting liability. So is there really a live dispute about this difference if there is any between actual knowledge and constructive knowledge? Are you going on the actual or trying to get it constructive because you think it is so obvious that there was a tort going? Right, I understand the question. The answer is we believe we meet both thresholds, actual knowledge, which is more difficult for us, and constructive knowledge, which is less difficult for us. Is it less, I mean, is it, because if I understand Minnesota law to get to constructive knowledge, it has to be a very close or long-term relationship between the tortfeasor and the defendant or just such an obvious action on the part of the tortfeasor. Isn't that almost a harder standard to prove than sort of, than the direct? Because direct, as you've noticed, is, I mean, there's no dispute that you could find direct knowledge through circumstantial evidence, right? Correct, correct. I don't know which is which is smarter. Well, I believe the circumstantial, I'm sorry, the constructive knowledge test handed down in the Wichman decision, which is what we're talking about, actually has a, it's conjunctive. We have to prove under that standard both illegality or clear tortiousness and a close or long-term relationship. But what's helpful for us in the constructive knowledge prove-up is that the Minnesota Supreme Court used an exemplar case to tell us or teach us all what they meant by that. And we have that in our briefing. It's the Diduck case, where it was a far more attenuated relationship, which gave rise to constructive knowledge liability. So I'll also point out that under, even under, if one viewed that as a high test, somehow higher than actual knowledge or circumstantial evidence of actual knowledge, we have that evidence even at the highest threshold that one might need to apply, at least in terms of passing the summary judgment barrier and demonstrating that giving reasonable inferences to the receivership, we get to trial. And in particular, we've briefed at length the intense socializing between Sarles and the schemers, and we've described them as professionally questionable ways. Not so much to demonstrate any moral judgment on what was going on, but rather to demonstrate the closeness of the relationship. That itself is a factor under the Wittsman standards, the nature of the relationship, improving of actual knowledge and substantial assistance. And likewise, the closeness of these, you know, attendance at cocktail parties and sporting events and other things, the closeness of the relationship between those parties demonstrates the lack of credibility of the target of this inquiry today. The lack of credibility of Mr. Sarles from 2010, when he testified under oath that he had quote-unquote limited contact with these various entities. So I should not leave the podium to surrender it to my brother before I mention that KNS partnership is a great case for us in its stating the legal standard, because it also states that a pattern of otherwise ordinary conduct may intimate or suggest an illegal scheme. So your honors, if I may, I'd like to reserve the remaining time for rebuttal. Mr. Weber. Thank you, your honor. Good morning, and may it please the court, Charles Weber for summary judgment by, and I quote, drawing inference upon inference in order to conclude that there may be a material fact issue somewhere, unquote. That was the problem with this case in the district court. It remains the problem with the case on appeal. The receiver is seeking to hold Associated Bank liable for $160 million Ponzi scheme based solely on the alleged knowledge of one employee and the bank's provision of checking accounts for about 18 months. The receiver virtually concedes that he has no direct evidence to support his claims, but he says he relies on circumstantial evidence in what he dubs inferences to get there. But it's not just that the receiver relies on inferences. You completely understand that on summary judgment you take reasonable inferences, well-based inferences, in the light most favorable to the non-moving party. The problem is that the receiver relies on inferences that are not well-based in the facts and, as I'll discuss in a moment, often stacks inferences on top of one another. Takes a fact, says I'm going to draw an inference from that, and based on that inference I'm going to draw another inference and another inference from which you could then infer actual knowledge. That is too far a stretch, and that's exactly what the district court held in this case. It was correct and we asked the court to affirm. Let me touch first on the knowledge standard for aiding and abetting liability since I guess it's not completely clear that my colleague is agreeing that it's an actual knowledge standard. We think it's pretty clear that it is from Wittsman. And the reason I say it's pretty clear is because that's how the Supreme Court of Minnesota in Wittsman described its main conclusion in the case from page 188, and I'm quoting, under the alleged facts we cannot infer that LL&F had actual knowledge that Wolfson was engaging in tortious conduct, end quote. That's how the Minnesota Supreme Court stated its conclusion. It obviously spoke in terms of actual knowledge, use those words. The other reason we know that it's actual knowledge is the court adopted section 876 of the restatement, and the vast majority of courts that have adopted section 876 have imposed an actual knowledge standard. And we've also pointed out to the court that the Minnesota standard in a case involving an alleged allegation of aiding and abetting against a bank. That's the Anderson decision that we cited in our materials. Now Wittsman does discuss constructive knowledge, but only to observe that, and I quote, some courts, unquote, have adopted it in certain circumstances as Judge Kelly recognized. The court primarily discussed and relied on a case that arises in the ERISA context. It's a case that the Second Circuit itself has abandoned, and that other courts have held does not apply to common law aiding and abetting claims like we have here. And Wittsman ended up just concluding, it's about a one paragraph discussion of constructive knowledge, said well even if constructive knowledge applied, the plaintiff there hadn't adequately pledged. But right after that discussion, Wittsman stated its conclusion that it couldn't infer actual knowledge right after discussing that. So Wittsman certainly never adopts a constructive knowledge test, it just discusses it as an alternative holding, basically dicta. And we think it's pretty evident that that's an actual knowledge standard that the receiver's held to. So let me move to discussing why the district court was right to say that there was insufficient evidence that Associated Bank had actual knowledge of wrongdoing by the companies that are in the receivership. As I said, the receiver virtually concedes there's no actual evidence of this. It's all circumstantial evidence, but inferences, the inferences that counsel is relying on. What we're looking at here is what was Sarles' motive. Why was he doing what he was doing? And it's sort of, I think we even have cases that say when you're looking at that sort of thing, summary judgment's kind of a hard deal. Maybe it'll end up that way after a trial, but when you're looking at why did he do certain things that looked like avoiding compliance scrutiny or whether or not there was a blank form that he tried to get someone to sign, just those sorts of things seem to be kind of fact-based to me. And I guess I'm not seeing your inference upon inference upon inference. It's sort of seemed to me kind of a judgment call on each one of the facts that maybe should be left for a jury. Yeah, and I can describe exactly sort of what the inference upon inference upon inference is. Give the court an example. Obviously in my 15 minutes, I can't canvas everything that we say is an invalid inference. But the opening of the account, as your honor just mentioned, the Crown Forex account in June 2008, the receiver says Sarles lied on the account form, all right? He says that he had a certificate from the Crown Forex and didn't. The receiver gives no citation in the brief for that claim, and that's because it's not what the form says. The form says, it refers to, quote, a report from a state registration website. It's undisputed that that form, that choice of language, was driven by Ms. Espy, who filled out the form. She testified that she chose the words that she thought best matched what she saw in the documents that she was given to open the account. She said she made that choice from a drop-down menu of a variety of choices, and she said it was the closest match. So we need a lot of inferences here to get from there to saying that Sarles knew about fraud. First, you've got to say, well, we start with the fact. We know that the form said, report from Secretary of State website. From that, you have to infer that somebody lied about that because it didn't have a certificate. Then you have to infer that it was Sarles who lied. Then you have to infer that he was lying to cover up the fact that he didn't really have a Secretary of State certificate, and then you have to infer that he did that because he's trying to cover up fraud that he knew about. It's just too many links in the chain to do that, and that's what a lot of most of their inferences are like here. The district court went through them and, I think, did a very nice summary of demonstrating why all of them are just too remote from the factual foundation that the receiver is relying on. It's just too many jumps to get there, and there's no doubt that you can use inferences, and especially in a case that relies on intent, although we're not talking about intent here. We're talking about actual knowledge, but you can use inferences, but they've got to be well-based in facts. The district court was saying that all of this was just too much a stretch, time after time. I hate to suggest it with the record. First of all, they submitted a 6,600-page appendix. I printed out all of the pages so that we didn't need 6,000 pages of appendix to get to what the guts of the case are, but if you go through those and examine the receiver's citation to record evidence, it shows that in most cases there's just not a tie. There's a small nugget of facts that the receiver then applies inferences to, inferences to, inferences to, and basically argues to the court, I get to tell whatever story I want based on the facts, and we're going to call it an inference, and that's just not accurate, and that's what bothered the district judge about this case is that all of this was basically stories that were based very loosely on a kernel of a fact and then took that fact and blew it completely to an illogical conclusion or at least one not supported by the facts, and this court has said you can't pile inference on inference to avoid summary judgment, and we've got that in two ways. We've got piling of inference on inference in two ways. One is just by the sheer number of inferences, which is basically what the receiver is relying on, and like I said, I can't go through all of them in 15 minutes, but here's an example, and it's one that counsel just mentioned. It's a fact that Sarles was present when the people running this scheme were quoting movie lines to each other and that they caroused, right, and they say that the movie lines were from movies that glorified greed, and there's no doubt that Sarles was present when that happened, but to infer from that that Sarles knew that they were conducting a Ponzi scheme is a bridge too far. As we pointed out in the brief, I have friends who like quoting lines from The Godfather, and I'm reasonably comfortable they're not mobsters, all right? You just can't. That's too tall an assumption to make on the facts. Now, that's just a one, sort of a one-step inference. The second reason we have piling of inference on inference is the to reach a different inference and another inference and another inference. It's almost like double hearsay, hearsay within hearsay. You just can't do that, and I've just described one way in which that happened, the June 2008 Crown Forex account, one way that we inferred that based on the description of the account, but they use that account opening for a lot of reasons that demonstrate, or a lot of arguments that demonstrate how they're stringing together these inferences. For example, they point out that the form for the account opening lists an address on Nicollet Avenue, and that's undisputed fact. It absolutely does, and you can find that at page 84 of the appendix. That's the address that was undisputedly given to us to put on the account. So the receiver then says, well, look, Sarles visited Kylie and Smith, the signatories on the account, in Burnsville, Minnesota, so he had to know the Nicollet address was a sham. Well, businesses often have more than one address. These businesses had more than one address. Sarles never went to Nicollet Avenue to check it out, and there's no evidence that he was supposed to. Bankers are not required to go and visit the actual physical address to make sure it checks out. But you're going through kind of fact by fact by fact, sort of knocking it down and going to the next one and knocking it down, but what about looking at all of them collectively so that maybe each individual action could be explained in isolation, but is there any error in doing that overall in every single piece of evidence that is not direct, but could make some kind of an Yeah, and I understand, sure, and I understand, Your Honor, that looking at the big picture is something that a court can do, but by the same token, that evidence, the evidence that is stitching together that story, the pieces actually have to be well-based. They can't be speculative, no matter how many there are, they can't be conjecture, they can't be speculative. As the Seventh Circuit put it in a similar case, and we may not have cited this in materials, if so, I apologize, I'll submit it in a Rule 28J letter. The Seventh Circuit had a similar case where they said zero plus zero still equals zero. You can add as many zeros as you want, but at the end of the day, the question is whether these facts rely on a sound, or whether these inferences rely on a sound factual basis, and the district court just said they're not, they're all reaches. The fact that you reach too far 29 times doesn't mean that you can get to a jury because, well, you've come up with enough reaches now that you've painted a picture of fraud, but if it's based on invalid assertions and based on facts, it doesn't count, even if you've got the whole picture in mind. Do you have, can you give us a reference to the record where we could find a description of the job responsibilities of Mr. Sarles? Oh, I can't off the top, if I could provide that as well. I have in my notes he worked in recruiting new business and client relationships. Yeah, he was an account manager. He was responsible for trying to go out and generate business through corporations that would open up checking and savings accounts at Associated Bank. That was pretty much the core of his job, and that's exactly what these accounts were. They were checking accounts, and we've heard a lot about how they were never designated as fiduciary accounts or the like. Ms. Espy testified that that wasn't possible. You had two choices when you designated the type of account. It was checking or savings, and she designated checking. But that's basically what Mr. Sarles was responsible for doing. He wasn't responsible for loans or anything like that, and it's undisputed that the bank never did the kinds of things that you would expect to see in a typical aiding and abetting case, right? Never financed this operation, never made loans to the operation, and never tried to recruit and invest to this operation. Associated Bank didn't try to sell its customers on the investment such that you could say, yeah, they materially, they substantially assisted the conduct of the scheme, which is what the substantial assistance prong means, and I'll get to in a second. There's just none of that kind of evidence. All that Associated Bank ever did was just allow the corporations to maintain accounts, and that's really the guts of what Mr. Sarles was selling, was just services, just account services for the bank, and nothing beyond that. The other point I wanted to mention, and I'm certainly, I don't have the time to go through and explain why all the facts, I just, I know you hear this from counsel probably all the time, I just urge the court to take a look at the record, more specifically, I imagine the court's clerks do, this will fall, and to take a look at the record and really compare the statements against what is in the record, because a lot of the times they don't match up. Is there a, this is a pretty big record. I think unnecessarily big, yeah. Is there a condensed version of the documents that the counsel believe are relevant to our review of the facts? It is very fact-based. It's multi-volume, is it not? It is. As I said, it's about 6,600 pages of exhibits, and when I print, or of material, when I print it out, I had somebody print out each page that both sides referred to, and it's just, it's sitting in one folder over there. It's about that thick. So if the court wished, I'm sure the parties could come up with sort of the condensed version. I think the issue here is that if the appellant was citing one page of a deposition, they put the whole deposition in the record, even if it was 200 pages long. So you end up with this sort of bloated appendix that is unnecessary. But yeah, it's, when you get right down to it, it's a couple hundred pages of stuff. I wanted to just respond to one last thing before I sit down, and that was this allegation that Mr. Seierls knew that all of the schemes, the way that they did business, and that Crown Forex S.A. was insolvent. There is no evidence of that. That is another invalid speculation. Their basis for that is testimony of a gentleman named Pettengill, who was one of the schemers, that's at pages 24, 22 to 24, 26 of the appendix. It all comes from there. Mr. Pettengill said there was one topic of discussion at the meeting they're referring to, and it was the need to create segregated investor accounts as counsel had advised them to do. That's what the topic of discussion was. He said there wasn't discussion of insolvency of Crown Forex or monkey business that Seierls was around for, and he was very unable to tie Seierls to any of this. Thank you, Your Honors. I appreciate it. How much time does counsel have? Thank you, Your Honors. Let me very quickly address. We asked the court for permission to submit a condensed appendix. We asked the clerk's office, and I understand there was some checking behind the scenes, and we received the answer, no. We would have loved to. We would have saved tens of thousands of dollars, but perhaps we should join the Judicial Conference Advisory Committee and help with the court on that. But let me go back to the argument. I didn't hear anything from Mr. Weber justifying the three just complete material factual errors in the summary judgment decision at pages 11, 13, and 15. I just didn't. Now, what I think I did just hear is that Mr. Weber went through a number of facts and gave his viewpoint of what the inferences are from those facts. But we're here on summary judgment. We're here on de novo review of a summary judgment decision. And of course, everyone here knows the reasonable inferences are drawn in favor of the non-movement, not the movement. So let me go to the last substantive point that my colleague just said. I strongly disagree with his statement of what the record shows from Mr. Pettengill. In page 2426, Mr. Pettengill confirms just what he said at his sworn declaration at 2686 that in front of Sarles, they discussed the insolvency of Crown 4XSA, the Swiss vehicle for all of this investor funding. They discussed the insolvency. They discussed the non-segregation of the accounts. And within that page range, Mr. Pettengill also confirmed that whatever aspect of it was prompted by a lawyer saying, hey, you need to get together and figure some things out. Mr. Sarles was not privy to any notion that a lawyer had triggered the need for that meeting. That meeting, April, May 2008, puts into Sarles' head that the proper dominion and control of the investor funds is these four pillars I talked about, segregated funds, no risk investment, liquidity of investment, and double-digit returns. It also simultaneously put into Mr. Sarles' head that those aspirations were not being met by these folks. That is knowledge of conversion. And what did he do? He assisted. He augmented the conversion by creating these account opening documents and assisting in them. Remember, he hand-delivered to them to sign, and then he received them and delivered them back to the bank. He endorsed the falsehoods as his own, regardless of whether Ms. Espy had any role to play. About Ms. Espy, another piece of inaccuracy that I just have to correct for the record, Ms. Espy supported Mr. Sarles. That's at 5672 to 73. Sarles directed Ms. Espy to create the information on the account opening forms, 5680. And finally, as far as the labeling of account, oh, it can only be checking or it can only be savings, that's not what the testimony shows. At 2019, the testimony shows that at a first level, at a highest level, the choices are only DDA money market, savings, and time deposit loan account. Those are the high level choices. Our expert, Ms. Guglieri, has demonstrated at 5490 through 91 and 5498 that there is a duty and an obligation on the part of the bank under the Bank Secrecy Act and Anti-Money Laundering Act and various other know-your-customer type acts, an obligation on the part of the bank to include in the account opening materials and include in the file what the use of the funds were going to be so they could know whether or not the funds were being used by money managers slash financial advisors who are the quote-unquote highest risk under the regulatory guidance from the Department of the Treasury. So, they could have put investor funds on the account opening papers. And let's not forget, what was the direction, the lean, pardon the pun, of the five various factual errors put in the account opening papers? It was in a direction to make this account look extraordinarily bland. One of the most uninteresting accounts you'll ever find, a new LLC just opened a checking money market account. It was not saying that it's a high-risk investor fund account so that the you know what was going on. So, Sorrells was smart. He was sophisticated. He was trained in know-your-customer. He knew this customer. It's his biggest one by far as a relationship manager. And just one more record citation, his training in know-your-customer regulations and policies, 5058 and 5073. For all these reasons, Your Honors, we believe that the District Court erred in granting summary judgment and we request that the summary judgment be reversed. There are no further questions. I'll step away. Thank you, Your Honor. Thank you, Your Counsel. All right. Thank you for your arguments this morning. It's been very helpful and the case is submitted. Does that conclude?